**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| HOLLY GROSSMAN OLIVER,<br><br>Plaintiff,<br><br>– against –<br><br>JOHN M. O'BRIEN,<br><br>Defendant. | Case No. 1:26-cv-00990<br><br>**COMPLAINT** |

Plaintiff Holly Grossman Oliver ("Plaintiff" or "Ms. Oliver"), by and through her counsel, Perrone Law LLC, complaining of Defendant John M. O'Brien ("Defendant" or "O'Brien"), alleges as follows:

## NATURE OF THE ACTION

1. This premises liability action arises out of a fall on the interior staircase of a vacation rental home that Defendant owns, controls, and rents to the public for profit at 17 Red Baron Strasse, Bartlett (Glen), New Hampshire (the "Premises").

2. The staircase at the Premises is a steep, straight, unbroken run leading down to the home's only bedrooms. Every tread and riser of that staircase is covered with a thick, dark, long-fibered carpet that has no contrasting nosing, edge marking, or color break of any kind, and the staircase is lit only by two small, low-level step lights. At the bottom of the staircase, the dark carpet, a black mat on the landing, and inadequate lighting combined to conceal where the final step ends and the landing begins, and the carpet near the bottom of the staircase was torn and damaged.

3. On the evening of August 15, 2026, while Ms. Oliver, a paying overnight guest, was descending that staircase, she was caused to fall at the bottom of the staircase as a result of its dangerous and defective conditions, and landed on her right knee.

4. The fall ruptured Ms. Oliver's right patellar tendon and tore the surrounding capsular and retinacular tissue, completely disrupting the extensor mechanism of her knee. She required surgical repair with implanted suture anchors and faces a long course of immobilization and rehabilitation.

**JURISDICTION AND VENUE**

5. Jurisdiction and venue are proper in this Court.

6. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different States: Plaintiff is a citizen of the State of Rhode Island and Defendant is a citizen of the State of Maine.

7. This Court has personal jurisdiction over Defendant because Defendant owns real property in New Hampshire, regularly conducts the business of renting that property to the public in New Hampshire, and committed the tortious acts and omissions alleged herein in New Hampshire, from which Plaintiff's claims arise. *See* N.H. Rev. Stat. Ann. § 510:4.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, and the property that is the subject of this action is situated in this District.

## THE PARTIES

9. At all times hereinafter mentioned, Plaintiff Holly Grossman Oliver was and is a natural person domiciled in the State of Rhode Island, residing at 56 Roosevelt Drive, Bristol, Rhode Island 02809, and is a citizen of the State of Rhode Island.

10. At all times hereinafter mentioned, Defendant John M. O'Brien was and is a natural person who, upon information and belief, is domiciled in the State of Maine, residing at 24 Rabbit Run, Portland, Maine 04102 (the address recited for him in his deed to the Premises and in his rental agreement for the stay at issue) and is a citizen of the State of Maine.

11. At all times hereinafter mentioned, Defendant owned the Premises, a single-family chalet-style home located at 17 Red Baron Strasse, Bartlett (Glen), New Hampshire, identified on the Town of Bartlett assessment records as Map 2LNDR, Lot 000007, Sub 000000.

12. Defendant acquired title to the Premises in his individual name, as "John M. O'Brien, a single person, of mailing address: 24 Rabbit Run, Portland, Maine 04102," by Warranty Deed from Janet M. Geggis executed in March 2010 and recorded in the Carroll County Registry of Deeds on March 25, 2010, conveying Lots 7 and 8 of the Linderhof Realty, Inc. subdivision in Bartlett, New Hampshire. Upon information and belief, Defendant has continuously held title to the Premises in his individual name since that time.

13. At all times hereinafter mentioned, Defendant operated the Premises as a short-term vacation rental, which he advertised to the public under the name "Schloss Linderhof" on the Vrbo online rental platform as Vrbo Property No. 933707ha, under the listing title "Behind Storyland! 4 BD, 2 BATH, Wireless! Views of mountains!"

14. At all times hereinafter mentioned, Defendant maintained the Premises.

15. At all times hereinafter mentioned, Defendant managed the Premises.

16. At all times hereinafter mentioned, Defendant controlled the Premises.

17. At all times hereinafter mentioned, Defendant inspected the Premises.

18. At all times hereinafter mentioned, Defendant furnished the Premises, including its interior staircase, floor coverings, and lighting.

19. At all times hereinafter mentioned, Defendant was responsible for keeping the Premises, including its interior staircase, in a reasonably safe condition for the guests to whom he rented it.

## FACTUAL BACKGROUND

### A. The Rental

20. Defendant advertised the Premises on Vrbo as a four-bedroom, two-bathroom chalet that sleeps ten guests, and promoted it to families with young children.

21. Through the Vrbo platform, Plaintiff's brother, William Grossman, rented the Premises from Defendant for the nights of August 14 through August 17, 2026, for a family vacation. Defendant collected rent, a cleaning fee, and New Hampshire rooms tax for the stay.

22. Defendant's written rental terms for the stay identified Defendant as "Landlord," reserved to Defendant a key to the Premises at all times and the right to enter to inspect and repair, and provided that Defendant would supply the electricity to the Premises.

23. Defendant knew and intended that the Premises would be occupied during the stay by multiple families, including small children. The guests during Plaintiff's stay included Plaintiff and her three-year-old son, her brother and his family, including children aged eight, four, and four months, and another adult guest with a two-year-old child.

24. At all relevant times, Plaintiff was lawfully on the Premises as a paying overnight guest with Defendant's knowledge and consent.

**B. The Staircase**

25. The Premises has a single interior staircase connecting the main living level to the level containing the bedrooms. Guests must use that staircase to get to and from the bedrooms.

26. The staircase is a steep, straight, undivided run of approximately thirteen to fourteen risers with no intermediate landing. It terminates directly onto a hard-surfaced landing adjacent to an exterior door.

27. Upon information and belief, the treads of the staircase measure less than the tread depth called for by applicable building codes and generally accepted safe stair-design practice.

28. Every tread and riser of the staircase is covered with a thick, dense, dark green, long-fibered carpet that is not a conventional stair runner or stair carpet. The carpet is uniform in color and texture from the top of the staircase to the bottom, with no contrasting nosing, edge stripe, tread marking, or color break of any kind.

29. The thick, dark, uniform carpet obscured the edges of the treads and the transition from one step to the next, defeating the visual depth cues a person descending a staircase relies upon to judge where each step ends.

30. The staircase was lit only by two small, low-wattage recessed step lights. Portions of the staircase, including the area of the final steps, were not directly illuminated and were in shadow. No fixture separately illuminated the transition from the final tread to the landing.

31. A black mat was placed on the landing at the foot of the staircase. The final tread bore no contrasting nosing, edge marking, or other visual cue of its own.

32. Together, the dark carpet on the final tread, the black mat on the landing below it, and the shadow at the bottom of the staircase made the final step and the landing difficult to

distinguish from one another, concealing the transition from the staircase to the landing from a person descending the staircase.

33. Upon information and belief, at the time of Plaintiff's fall, the carpet near the bottom of the staircase was torn and damaged.

34. Upon information and belief, Defendant selected, installed, or approved the carpet, lighting, and other finishes on the staircase and landing, and placed or permitted the mat at the foot of the staircase, as part of furnishing the Premises for short-term rental use.

35. The configuration, carpeting, lighting, and mat described above were permanent or long-standing features of the Premises that Defendant owned, furnished, and rented to the public, and Defendant knew or, in the exercise of reasonable care, should have known of them.

36. Upon information and belief, the damage to the carpet near the bottom of the staircase existed for a sufficient length of time that Defendant, in the exercise of reasonable care, including reasonable inspection of the Premises between rentals, should have discovered and repaired it.

37. Defendant knew or should have known that his guests, including families with young children, would use the staircase at night to reach the bedrooms, and that the conditions described above created an unreasonable risk that a guest would misjudge the final step and fall.

38. Defendant did not warn Plaintiff or any other guest of the dangers presented by the staircase, did not mark or highlight the final step, did not add lighting to the staircase or the landing, did not remove or relocate the mat, and did not replace the carpet with a stair-appropriate covering.

**C. The Fall**

39. On August 15, 2026, at approximately 8:45 p.m., Plaintiff descended the interior staircase toward the bedrooms in a careful and reasonable manner.

40. As a result of the dangerous and defective conditions of the staircase described above, including the shallow treads, the dark carpet, the black mat, and the inadequate lighting that together concealed the final step, Plaintiff was caused to fall as she reached the bottom of the staircase.

41. Plaintiff fell directly onto the front of her right knee and struck the wall at the foot of the staircase. She was immediately unable to straighten her right leg or bear weight on it.

42. After the fall, while Plaintiff's brother was helping her from the Premises to a vehicle to obtain emergency care, Plaintiff's injured right knee gave way and she fell a second time, striking her right knee and side and suffering significant additional pain.

**D. Plaintiff's Injuries and Treatment**

43. Plaintiff was taken that night to the Emergency Department of Memorial Hospital in North Conway, New Hampshire, where x-ray and ultrasound imaging showed a high-riding patella and a rupture of the right patellar tendon. Plaintiff was placed in a knee immobilizer, given crutches, and discharged with instructions to obtain prompt orthopedic care.

44. On August 17, 2026, Plaintiff was evaluated by an orthopedic surgeon at University Orthopedics in Rhode Island, who confirmed an acute traumatic rupture of the right patellar tendon with complete disruption of the knee's extensor mechanism and recommended operative repair. An MRI performed on August 20, 2026 confirmed the rupture.

45. On August 26, 2026, Plaintiff underwent surgery at Rhode Island Hospital consisting of a right patellar tendon repair with two implanted suture anchors and a separate repair of medial and lateral capsular and retinacular tears of the right knee.

46. Following surgery, Plaintiff has been required to remain in a hinged knee brace locked in extension, to use crutches, and to undergo a staged course of physical therapy and rehabilitation expected to last many months.

47. As a result of her injuries, Plaintiff has been unable to drive, unable to use stairs normally, unable to sleep comfortably, unable to care for her young son without assistance, and unable to work for extended periods, and she has incurred and will continue to incur medical expenses, lost earnings, and the cost of childcare and household help.

## CAUSE OF ACTION

### Negligence

48. Plaintiff reiterates and re-alleges each of the foregoing allegations with the same force and effect as if fully set forth herein.

49. As the owner and landlord of the Premises, who rented it on a short-term, furnished basis to members of the public while retaining a key, the right of entry, and responsibility for its furnishings, utilities, and condition, Defendant owed Plaintiff a duty to act as a reasonable person under all the circumstances, including the likelihood of injury to others, the probable seriousness of such injuries, and the burden of reducing or avoiding the risk. Defendant's duty included the duty to use ordinary care to keep the Premises, including its interior staircase, in a reasonably safe condition; to inspect for and remedy dangerous conditions of which he knew or, in the exercise of reasonable care, should have known; to warn entrants of dangerous conditions; and to take reasonable precautions to protect entrants against foreseeable dangers arising out of the arrangements or use of the Premises.

50. At all relevant times, Defendant was the owner and lawful possessor of the Premises, and Plaintiff's claims arise from Defendant's ownership, possession, control, operation,

repair, maintenance, and upkeep of the Premises, including the condition of its interior staircase, floor coverings, mat, and lighting as they existed at the time Defendant rented the Premises to Plaintiff's family.

51. Defendant's duty to keep the Premises reasonably safe for his guests was his own and could not be delegated to, waived by, or avoided by allocating it to, any tenant, property manager, cleaner, contractor, or other person, nor could Defendant by contract relieve himself of the consequences of his failure to exercise ordinary care. To the extent Defendant relied on any other person to maintain, clean, or inspect the Premises, Defendant remains liable for any failure to maintain the Premises in a reasonably safe condition as though he had retained that maintenance in his own hands.

52. It was reasonably foreseeable to Defendant that a guest descending the staircase, including at night and including members of families with young children to whom he marketed and rented the Premises, would be injured as a result of the conditions described above. Defendant created those conditions or, at a minimum, had actual or constructive notice of them, because he knew or, in the exercise of reasonable care, should have known that the conditions of the staircase were such as to create an unreasonable risk of harm to his guests.

53. The danger presented by the bottom of the staircase was not open and obvious. Whatever could be seen of the staircase generally, the combination of the dark carpet, the black mat, and the inadequate lighting concealed where the final step ended and the landing began, and Defendant gave no warning of that concealed danger, whether by marking the final step, by signage, by communication with his guests, or otherwise. Plaintiff was entitled to rely on Defendant to keep the staircase in a reasonably safe condition.

54. Defendant breached his duty to Plaintiff by failing to keep the Premises in a reasonably safe condition, by creating or permitting dangerous conditions on the staircase, by allowing those conditions to be and remain on the Premises despite notice thereof, and by failing to remedy or warn of the dangerous conditions of which he knew or should have known.

55. Defendant was reckless, careless and negligent in maintaining a staircase with treads of insufficient depth; in covering, or permitting the covering of, the staircase with a thick, dark, long-fibered carpet that obscured the edges of the treads; in failing to provide contrasting nosings, edge markings, or any other visual cue distinguishing one step from the next; in failing to mark, highlight, or otherwise distinguish the final step from the landing; in failing to provide adequate lighting on the staircase and at the transition from the final step to the landing; in placing or permitting a mat at the foot of the staircase that, together with the dark carpet and inadequate lighting, concealed the final step; in permitting the carpet near the bottom of the staircase to be and remain torn and damaged; in failing to reasonably inspect the staircase and to discover and correct its dangerous conditions before renting the Premises to Plaintiff’s family; in failing to warn Plaintiff of the dangerous conditions of the staircase; in failing to provide a proper and reasonably safe means of access to the only bedrooms in the Premises; in renting the Premises to families with young children, whom he knew would use the staircase at night, without making the staircase reasonably safe for that foreseeable use; in failing to maintain the staircase in conformity with applicable building codes and generally accepted safe stair-design practices; in violating applicable laws, rules and regulations; in failing to exercise reasonable care under the circumstances; and Defendant was otherwise reckless, careless and negligent.

56. As a direct and proximate cause of the foregoing, Plaintiff was caused to suffer severe and permanent personal injuries, including, but not limited to, a complete traumatic rupture

of the right patellar tendon with approximately 1.5 cm of tendon retraction; complete disruption of the extensor mechanism of the right knee; traumatic tears of the medial and lateral capsular and retinacular tissue of the right knee extending through the joint capsule; internal derangement of the right knee; significant patella alta, with proximal migration of the patella; a palpable tendon defect immediately below the inferior pole of the patella; right knee joint effusion; anterior soft-tissue swelling and extensive posttraumatic subcutaneous edema; a pop felt in the knee at the time of the fall; immediate and severe anterior knee pain; inability to actively extend the right knee or perform a straight-leg raise; inability to bear weight normally on the right leg; instability of the right knee; a markedly antalgic gait; a second fall when her injured right knee gave way, striking her right knee and side; required and underwent emergency evaluation at Memorial Hospital in North Conway, New Hampshire, including radiographs and ultrasound of the right knee; required immobilization in a knee immobilizer and the use of crutches; required orthopedic evaluation and a STAT MRI of the right knee; required and was prescribed a custom telescoping hinged knee brace locked in full extension during ambulation and sleep; required and underwent open surgical repair at Rhode Island Hospital on August 26, 2026, under general anesthesia with a regional nerve block and a thigh tourniquet, consisting of debridement of the inferior pole of the patella to bleeding bone, implantation of two Arthrex 4.75-mm Corkscrew double-loaded suture anchors into the patella, repair of the patellar tendon using running locking Krackow sutures, separate repair of the medial and lateral capsular and retinacular tears with #2 FiberWire, and augmentation of the repair with the preserved tendon stump; surgical scarring; permanently implanted hardware in the right patella; required post-operative aspirin therapy for prophylaxis against deep vein thrombosis; required protected weight bearing with crutches and a hinged knee brace; prolonged immobilization of the right knee; restrictions on knee flexion and quadriceps activity; required and

will continue to require months of supervised physical therapy and rehabilitation; loss of mobility; loss of strength, motion, and function of the right knee; difficulty with, and fear of, using stairs; inability to drive; sleep disturbance; inability to perform activities of daily living, household tasks, and the care of her young child without assistance; inability to work; increased risk of persistent quadriceps weakness, persistent extensor lag, stiffness and arthrofibrosis, loss of knee flexion, recurrent rupture or failure of the repair, fixation or hardware failure, and the need for additional surgery; loss of the ability to engage in recreational activities she previously enjoyed; past and future pain and suffering; mental anguish and emotional distress; loss of enjoyment of life; and Plaintiff has been otherwise damaged; all of which damages are permanent in nature and will continue.

57. As a further direct and proximate cause of the foregoing, Plaintiff has suffered and will continue to suffer damages, including past and future medical, surgical, rehabilitative, and pharmaceutical expenses; past and future lost earnings and loss of earning capacity; the cost of childcare, household services, and other assistance; past and future pain and suffering; past and future mental and emotional distress; loss of enjoyment of life; and impairment, some or all of which may be permanent.

58. By reason of the foregoing, Plaintiff is entitled to recover all of her damages from Defendant.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all claims so triable.

WHEREFORE, Plaintiff demands judgment against Defendant to recover all damages properly recoverable, together with interest and costs.

Dated: November 20, 2026

Respectfully Submitted,

/s/ Daniel C. Perrone

Daniel C. Perrone
**PERRONE LAW LLC**
3600 NJ-66, Suite 150
Neptune, New Jersey 07753
(833) 287-6748
dcp@theperronefirm.com